```
              UNITED STATES DISTRICT COURT
            SOUTHERN DISTRICT OF MISSISSIPPI
                     EASTERN DIVISION
```

BRENDA GASKIN                                              PLAINTIFF

VS.                                  CIVIL ACTION NO. 4:06cv114TSL-JCS

VILLAGE OF PACHUTA, et al.                                DEFENDANTS

### MEMORANDUM OPINION AND ORDER

This cause is before the court on the motion of defendants Village of Pachuta, Mississippi and Alton Lightsey for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.  Plaintiff Brenda Gaskin has responded in opposition to the motion and the court, having considered the memoranda of authorities, together with attachments, submitted by the parties, concludes that defendants' motion should be granted.

In September 2003, Brenda Gaskin became employed by the Village of Pachuta (the Village) as city clerk and court clerk, and she remained so employed until February 1, 2005, when the Board of Aldermen (the Board), of which defendant Alton Lightsey was a member, voted unanimously to terminate her employment. Gaskin filed this suit, asserting claims against the Village under 42 U.S.C. § 1983 for alleged violations of her constitutional rights to due process and equal protection, and asserting, in addition, state law claims against Lightsey for intentional interference with employment.  As expressed in her complaint and

in her memorandum filed in response to defendants' motion, the basic theory underlying Gaskin's claims is that Lightsey wanted to run for mayor and wanted to get rid of Gaskin because he knew that then-incumbent mayor, William McNeill, who was dating Gaskin, would not seek reelection if Gaskin were no longer employed. Gaskin posits that in order to further his own political aims, Lightsey persuaded the other Board members to vote to discharge her based on trumped-up allegations of poor job performance. She maintains that, in fact, the Board's alleged concerns about her work performance were unfounded and yet the charge that she was fired for not doing a good job was "spread throughout the community." She complains that the Village, in violation of her due process rights, did not give her a hearing prior to her discharge or a name-clearing hearing following her discharge, despite her request for an opportunity to refute the Board's claimed reasons for her discharge. She further alleges that she was denied equal protection because she was treated differently than other city workers who were not dating the Lightsey's "political enemy."

Defendant Village of Pachuta argues in its motion that Gaskin cannot prevail on her due process claim relating to the Board's failure to provide her with a pre-termination hearing because as an at-will employee, Gaskin did not have a property interest in

her position.[1]  Indeed, Gaskin does not dispute she was an at-will employee and therefore had no property interest in her employment. Accordingly, she cannot maintain a due process claim based on the Village's alleged failure to give her a hearing prior to voting to terminate her employment.  See Farias v. Bexar County Board of Trustees for Mental Health Mental Retardation Servs., 925 F.2d 866, 877 (5th Cir. 1991) (employee who could be discharged at will, had no protectible property interest and no right to a due process hearing); King v. Newton County Bd. of Sup'rs, 144 Fed. Appx. 381, 384, 2005 WL 1750102, 3 (5th Cir. 2005) (where county's employment manual made clear that employment was at-will, employee had no property interest in her employment and her § 1983 claim for due process violation failed as matter of law).[2]

The Village next argues that Gaskin cannot prevail on her due process claim based on an alleged infringement of her liberty

---

[1] The court notes that despite some ambiguity in her complaint, Gaskin is not asserting federal claims against Lightsey but rather is suing him solely for alleged interference with employment.

[2] According to defendants' motion, Gaskin also attempts to ground a due process claim on an allegation that the Board's vote to discharge her was illegal because the vote was taken while the Board was in executive session.  As she had no property interest in continued employment, Gaskin cannot base a due process claim on an irregularity in the procedure by which she was terminated. Nevertheless, the court notes that plaintiff has not demonstrated that the Board could not lawfully vote to discharge her while in executive session, and in any event, her objection to the procedure is moot by virtue of the Board's having subsequently voted to reaffirm its earlier discharge decision.

interest because (1) termination of an employee for alleged deficiencies in an employee's job performance, as a matter of law, is not sufficiently stigmatizing to give rise to a liberty interest, and because in any event (2) plaintiff was effectively given a name-clearing hearing.

The Supreme Court has recognized a procedural due process right to notice and an opportunity to clear one's name when the government discharges an employee in a manner that puts the employee's "good name, reputation, honor, or integrity . . . at stake." See Board of Regents of State Colleges v. Roth, 408 U.S. 564, 573, 92 S. Ct. 2701, 33 L. Ed. 2d 548 (1972); see also Hughes v. City of Garland, 204 F.3d 223, 225-26 (5th Cir. 2000). To prevail on her claim that the Village infringed upon a cognizable liberty interest by denying her the opportunity to clear her name, Gaskin must show: "(1) that she was discharged; (2) that stigmatizing charges were made against her in connection with the discharge; (3) that the charges were false; (4) that she was not provided notice or an opportunity to be heard prior to her discharge; (5) that the charges were made public; (6) that she requested a hearing to clear her name; and (7) that the employer refused her request for a hearing." Hughes, 204 F.3d at 226.

The Village argues that Gaskin cannot prevail on this claim as no stigmatizing charges were made concerning Gaskin in connection with her termination. The mere fact that an employee

4

has been discharged does not trigger the protections of due process.  Rather, "a liberty interest is infringed, and the right to notice and an opportunity to clear one's name arises, only when the employee is 'discharged in a manner that creates a false and defamatory impression about him and thus stigmatizes him and forecloses him from other employment opportunities.'"  Bledsoe v. City of Horn Lake, Miss., 449 F.3d 650, 653 (5th Cir. 2006) (citations omitted); see also Felder v. Hobby, 1999 WL 1067892, 4 (5th Cir. 1999) (holding that to establish deprivation of liberty interest in reputation without due process of law, plaintiff "must first allege facts establishing that her liberty interest was implicated–namely, that she was terminated based on charges that were (1) false, (2) publicized, and (3) stigmatizing to either her standing or reputation in her professional community or her ability to find other employment").  "In order to acquire a liberty interest protected by the Fourteenth Amendment and give rise to a name clearing hearing, [plaintiff] must establish the:

> charges against [her] rise to such a level that they create a 'badge of infamy' which destroys the claimant's ability to take advantage of other employment opportunities.  Additionally, the claims must be false and the claimant must show that damage to his reputation and employment opportunities has in fact occurred.

Farias, 925 F.2d at 877–78 (quoting Evans v. City of Dallas, 861 F.2d 846, 851 (5th Cir. 1988)).  Elaborating on this requirement, the Fifth Circuit has explained that the kind of "moral stigma" required to support finding a liberty interest "'usually derives

5

from serious, specific charges and implies an inherent, or at least persistent, personal condition which both potential employers and one's peers would want to avoid.'" Felder, 1999 WL 1067892, at 5 (citing examples, including dismissals for dishonesty, for lying on job application, for having committed a serious felony, for manifest racism, for serious mental illness, and for lack of intellectual ability (as distinguished from performance)) (citations omitted). On the other hand, statements that an employee has been terminated for his or her inadequate job performance, suggest a mere "situational difficulty rather than a "'"badge of infamy,"' public scorn, or the like,"'" id. (citations omitted), and hence do not give rise to a liberty interest.[3] Thus, Gaskin's allegation that her liberty interest was infringed

---

[3] The court in Felder cited numerous examples of cases so holding, as follows:
> Vander Zee v. Reno, 73 F.3d 1365, 1369 (5 Cir. 1996) (accusation of exercising "poor judgment" not sufficiently stigmatizing to implicate liberty interest); Blackburn v. City of Marshall, 42 F.3d 925, 936 (5 Cir. 1995)(newspaper article containing adverse comments on plaintiff's qualifications and attitude insufficient); O'Neill v. City of Auburn, 23 F.3d 685, 691 (2 Cir. 1995)(charge of "incompetence" and sloppy work insufficient); Connolly v. Comptroller of the Currency, 876 F.2d 1209, 1215 (5 Cir. 1989)(public statement that plaintiff lacked qualifications insufficient); Huffstutler v. Bergland, 607 F.2d 1090, 1092 (5 Cir. 1979)(rating of honesty as "unsatisfactory" insufficient); Stretten v. Wadsworth Veterans Hospital, 537 F.2d 361 (9th Cir. 1976)(incompetence, inability and unwillingness to deal with co-workers in a professional manner insufficient).

Felder, 1999 WL 1067892, at 5.

because word was spread throughout the community that she was fired for "not doing a good job" does not present a cognizable claim for relief.

Although not alleged in her complaint as a basis for her liberty interest, Gaskin argues in her response that she was also stigmatized by a charge that she was fired because she was dating the mayor. In this regard, Gaskin claims that among the reasons given by some Board members for voting to terminate her was their belief that a conflict of interest existed by virtue of her dating the mayor. She argues that this "constitutes a charge that she was using her relationship with the Mayor to abuse her position as Village Clerk, which implicates both morality and honesty."[4] Gaskin alleges, specifically, that two Board members, Lightsey and Shirley Johnson, told Mayor McNeill after the vote in November that they felt he and Gaskin "needed to be separated." Further, she points out, Board member Dorothy Lightsey testified by deposition that she voted to terminate Gaskin because of her relationship with the mayor. However, not only has Gaskin not alleged that this purported basis for her discharge was publicly

---

[4] Plaintiff herself declares that there was nothing improper about her relationship with Mayor McNeill. As neither was married, there was no reason they should not have been romantically involved, and there was no rule against employees dating, or against an employee dating the mayor. Thus, to merely have cited the fact that plaintiff was dating the mayor as a basis for her termination was not stigmatizing. Only if there were some additional allegation of impropriety could plaintiff possibly have an actionable due process claim.

disclosed by the Board, which omission in itself is a basis for dismissal of the claim, but she also has offered no evidence that any Board member, in fact, ever asserted (publicly or privately) that Gaskin had used (or would likely use) her relationship with the mayor to abuse her position as village clerk.  There was no insinuation that plaintiff had done (or was likely to do) anything improper, and nothing otherwise said to impugn her integrity.[5]  Though plaintiff contends otherwise, no such insinuation could reasonably be said to be implicit in the simple statement that her dating the mayor created a conflict of interest.  Accordingly, plaintiff cannot maintain a due process claim based on the possible public disclosure that plaintiff was discharged because she was dating the mayor.

The Village asserts that even if plaintiff had identified a liberty interest, she cannot succeed on this claim because she was effectively given a name-clearing hearing.  In the court's opinion, the record, including plaintiff's own evidence and argument, confirm this.  It is undisputed that plaintiff went to

---

[5] Defendants argue in that portion of their rebuttal brief addressed to plaintiff's equal protection claim that Gaskin's sexual relationship with the mayor indicated a lack of morality on plaintiff's part, given that the two were unmarried.  Whether or not that would be a reasonable conclusion is not an issue with which the court need be concerned, for plaintiff has not alleged that any member of the Board claimed to have voted to discharge her because of her sexual relationship with the mayor; rather, they claimed to have fired her, in part, because of her "dating" the mayor.

the February 8, 2005 meeting of the Board of Alderman to address the Board because, as she put it, she wanted to clear her name. At that meeting, she was allowed to address the Board for as long as she wanted, on any subject she wanted, and was able to present others to speak in her behalf. According to plaintiff, at this meeting, a public meeting, she was able to bring in the Village's books to show to Board members and was able to prove that, contrary to charges that had been made, she had been keeping the Village's books up-to-date. In the meeting, she also addressed the Board's alleged concerns relating to her hours, stating her position on that issue. She claims she was also able to prove to the Board that they were wrong about certain raises she had received, another issue that had been identified in connection with her discharge. She states, though, that "all this was for naught," as the Board members had already made up their mind and were not going to change the decision; indeed, after plaintiff's presentation, the Board again voted unanimously to confirm its decision to discharge her.[6] The fact that the Board did not change its decision does not detract from the conclusion that the

---

[6] In his deposition, Alton Lightsey testified that the Board did not give Gaskin a name-clearing hearing because the Board did not perceive that any defamatory charges had been made about her and so there was no need to give her a chance to clear her name. However, despite this testimony, it is clear to the court that in substance, the Board hearing on November 8 would have satisfied any obligation the Board could possibly have had to afford plaintiff a name-clearing hearing.

9

Board did allow plaintiff the opportunity to publicly clear her name.  Accordingly, for this reason, and others given supra, the court concludes that the Village is entitled to summary judgment on this claim.

In addition to her due process claims, Gaskin has undertaken to assert an equal protection claim.  She does not allege a traditional class-based-animus equal protection claim; rather, relying on Village of Willowbrook v. Olech, 528 U.S. at 562, 120 S. Ct. 1073, 145 L. Ed. 2d 1060 (2000), she attempts to assert a "class of one" equal protection claim.  In Olech, the Supreme Court held that a plaintiff may state a claim for violation of the Equal Protection clause when plaintiff "alleges that he has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment."  Id. at 564, 120 S. Ct. 1073.  As the court understands it, plaintiff's position is that defendant violated her right to equal protection because its "discriminating against [her] because of who she dated" lacked any rational basis.  She declares, "Who one dates on their own time cannot be a valid criteria, especially as there were no rules prohibiting Gaskin and McNeill from dating."

Defendants contend plaintiff cannot succeed on this claim because she cannot prove that there were other similarly situated employees who were treated differently or that the Village lacked

10

a rational basis for any difference in treatment of arguably similarly situated employees, both being essential elements of her claim.

To succeed on a "class of one" claim, the plaintiff must first prove that there were similarly situated individuals who were treated differently; and "the level of similarity between plaintiffs and the persons with whom they compare themselves must be extremely high." Neilson v. D'Angelis, 409 F.3d 100, 104 (2d Cir. 2005); see also Jennings v. City of Stillwater, 383 F.3d 1199, 1213 (10th Cir. 2004) (requirement of proof that others were similarly situated is "especially important in class-of-one cases"); Purze v. Village of Winthrop Harbor, 286 F.3d 452, 455 (7th Cir. 2002) ("In order to succeed, the [plaintiffs] must demonstrate that they were treated differently than someone who is prima facie identical in all relevant respects."). In the court's opinion, plaintiff has not created a triable issue on this element of her claim.

It is clear from the record that the Village had only two regular employees, Gaskin, and James Skidmore, who was "over the water department." Defendants submit that as Skidmore was not dating the mayor, he and Gaskin were not similarly situated. It seems to the court, however, that since Gaskin's contention is that her dating the mayor was the Village's reason for firing her and that this was not a rational basis for discharging her, the

pertinent inquiry would be whether she and Skidmore were similarly situated in all respects other than the fact of her dating the mayor. In the court's opinion, plaintiff has not shown that to be the case. Indeed, plaintiff has done nothing more than show Skidmore was also a Village employee; and to merely show that there was another employee is not to show that he and plaintiff were similarly situated. It is clear, in any event, that they were not.

Plaintiff's position as village clerk, in contrast to that of Skidmore, was much more closely related to the administration of Village government. Indeed, judging by plaintiff's own description of her own job duties, she had responsibilities in virtually every area of city government. She was responsible for maintaining virtually all the Village's records, including land records, tax records and financial records. She was responsible for keeping up with all the Village's finances, including having responsibility for accounts receivables, accounts payable, payroll, collection of taxes, collection of water bill payments, payment of taxes, and for maintaining all the Village's bank accounts (seventeen in all). She also assisted in making the Village's budget. Further, she was responsible for attending Board meetings and keeping the minutes of Board meetings, and in that role worked closely with Mayor McNeill and the Board. There is nothing to suggest that Skidmore's job, either in terms of the

types of duties of level of responsibility, was comparable to that of plaintiff, particularly as it related to the day-to-day functioning of the government in Pachuta. Given her position, then, as contrasted with that of Skidmore, the Board could readily have considered the potential relevance of her relationship with the mayor to have been much greater. Given that there were no other similarly situated employees, plaintiff cannot maintain an equal protection claim. In sum, then, the court concludes that the Village is entitled to summary judgment on all plaintiff's claims against it.

Gaskin has alleged a state law claim against Alton Lightsey for malicious interference with her employment, both with the Village and with the Tallahala Water Association.[7] To succeed on her claim for interference with employment, plaintiff must show that Lightsey's actions "(1) were intentional and willful;

---

[7] Plaintiff also appears in her response memorandum to be attempting to assert a due process claim against the Village for Lightsey's communication with the Tallahala Water Association concerning Gaskin. Plaintiff has offered no authority to suggest that a due process claim might lie on the basis that a former employer has provided information to a subsequent employer, even if intentionally false information was provided. Beyond that, the Village could not be liable for Lightsey's statements in any event. In speaking to representatives of the Water Association, Lightsey was not a spokesman for the Board, a fact evidenced by the fact that at least one other Village Board member was contacted by the Water Association for information on Gaskin and this Board member confirmed that the Village used QuickBooks and BBI and expressed that Gaskin had done a good job for the Village.

(2) were calculated to cause damage to the plaintiff engaged in a lawful business; (3) were done with the unlawful purpose of causing damage and loss, without right or justifiable cause on the part of the defendant; and (4) resulted in actual damage and loss." Hammons v. Fleetwood Homes of Miss., Inc., 907 So. 2d 357 (Miss. Ct. App. 2004).

Defendant contends that plaintiff cannot succeed on her claim against Lightsey for interfering with her contract with the Village for any of a number of reasons, principal among which is that Lightsey was but a single alderman who could not have single-handedly caused her discharge.

Plaintiff acknowledges that Lightsey was only one of five alderman and that she could not have been terminated by the vote of one alderman. She contends, however, that Lightsey, in effect, "ran" the Board, and that his actions and influence over other Board members were what caused her to be fired by the Board. In the court's opinion, plaintiff's evidence does not support her position. That is, there is insufficient evidence to support a finding that Lightsey possessed leverage and exerted influence over his fellow Board members, particularly with respect to the issue of plaintiff's discharge.

The only evidence to support plaintiff's position in this regard is McNeill's testimony that he perceived Lightsey as having what he felt was an "upper hand" and "carried a lot of weight"

with the Board. However, these is no competent evidence that Lightsey was the driving force behind an effort to get Gaskin fired, or that he undertook to persuade other Board members to vote to discharge her.

To reiterate, plaintiff's theory is that Lightsey instigated an effort to get rid of her so that McNeill would not run for reelection. However, there is no proof to support this theory, only speculation. On this subject, McNeill testified that he could only speculate that the Board wanted him out so that Lightsey could run as mayor. He deduced that simply from the fact that the Board fired Gaskin. When asked whether anything had been done or said to lead him to that conclusion, McNeill testified, "Well, they fired her. And they knew that we were close, you know. Been friends a long time. And I kind of thought that they got rid of her, you know, then I wouldn't have much interest in it. That's just my feeling. It's just, you know, speculation." Plaintiff herself testified that she "felt like Alton felt that. That he would – that he thought Bill might either quit or not run again" if she were no longer the village clerk; but when asked whether anyone else had ever expressed this view to her, she stated only that Bill had told her he felt that Alton may have thought that.

Moreover, plaintiff has offered no proof that Lightsey influenced, or even tried to influence Board members to vote to

discharge her.  In fact, McNeill, who was present during the executive session in which the Board first voted to terminate Gaskin, testified that there was no discussion by anyone of any reasons for firing her, but rather, the Board simply met, voted and instructed McNeill to tell Gaskin she was fired.  It was obvious, he said, that they had all discussed the issue before the session, but as he was not privy to the discussions he obviously could not comment on what had transpired.  In fact, while he did testify that he thought Lightsey may have wanted plaintiff gone, he also testified that he thought that another Board member, Keith Bogan, may have been "after her to get rid of her."

Finally, it is clear from the record that each Board member had his or her own individual concerns which led him or her to vote for Gaskin's termination.  Some voted for her discharge based solely on performance issues; others primarily on performance issues; and one based solely on Gaskin's relationship with the mayor.  Given all these circumstances, Lightsey cannot be held liable for malicious interference with Gaskin's employment with the Village.  See Bowen v. Watkins, 669 F.2d 979, 985 (5th Cir. 1982) (vote of one alderman is not causation where same result would have been reached without his vote).

After plaintiff's termination, she was hired by the Tallahala Water Association, initially as a probationary employee.  She was terminated one day before the end of her probationary period,

16

allegedly because Alton Lightsey told the manager of the Water Association and members of the Water Association's board of directors that Gaskin had no experience with two bookkeeping programs used by the Water Association, QuickBooks and BBI. Gaskin maintains that, in fact, she had extensive experience with both programs, having used them during her employment with the Village, and that Lightsey's statements not only challenged her qualifications for her job with the Water Association, but also, given that she had included her QuickBooks and BBI experience on her resume, "ended up as an attack on her honesty" and cost her the job. However, Mack Lee, manager of the Water Association, testified that the decision to terminate Gaskin was based solely on her job performance and lack of productivity. He testified that at the request of Board member Terry Windham, who had evidently spoken with Alton Lightsey, he, Lee, telephoned Lightsey to inquire about Gaskin. Lee stated that he asked Lightsey about Gaskin's experience with QuickBooks and BBI, as she had indicated experience with these programs on her resume, and according to Lee, Lightsey was unsure about what programs the Village had. Lee testified that the Water Association had a newer version of these programs than the Village had, and that during her time with the Water Association, Gaskin had not been able to use the Water Association's versions of QuickBooks and BBI effectively, to the Board's satisfaction. Gaskin, herself, testified that "Mack Lee

17

called Pachuta and found that they did" have QuickBooks and BBI. Given Lee's unequivocal testimony that the decision to terminate Gaskin's employment was due to her job performance,[8] Gaskin cannot prove she suffered any actual damage or loss as a result of Lightsey's alleged statements about her lack of experience with QuickBooks and BBI.[9]

Based on the foregoing, it is ordered that defendants' motion for summary judgment is granted.

A separate judgment will be entered in accordance with Rule 58 of the Federal Rules of Civil Procedure.

SO ORDERED this 2nd day of March, 2007.

/s/ Tom S. Lee
UNITED STATES DISTRICT JUDGE

---

[8] Gaskin has offered testimony from Terry Windham that when he called Lightsey, midway through Gaskin's probationary period, to inquire about her work with the Village and to ask about her experience with QuickBooks and BBI, Lightsey, as best Windham could recall, said that the Village did not have those programs. However, Windham talked to others who confirmed that the Village did have both programs, and thus, at the time Gaskin was terminated, Windham knew both that she had the claimed experience and that she had not lied on her resume. In any event, Windham testified that he just went along with Mack Lee's decision on whether to keep Gaskin or let her go since Lee was the one who had to work with her everyday.

[9] The court does not assume she could prove the other elements of her claim against Lightsey; it simply need not consider whether she could or not.